STATE OF WISCONSIN     CIRCUIT COURT     MANITOWOC COUNTY

---

STATE OF WISCONSIN,
           Plaintiff,

vs.                                **Case No. 05 CF 381**

STEVEN A. AVERY,
           Defendant.

---

### DECISION AND ORDER
### ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON
### MULTIPLE ENTRIES UNDER THE NOVEMBER 5, 2005 SEARCH WARRANT

---

#### The Suppression Motion

The defendant has moved to suppress evidence obtained by the State pursuant to the search warrant issued at 3:30 p.m. on November 5, 2005. Specifically, the defendant asserts that when the State entered the defendant's trailer and garage on multiple occasions following the issuance of the warrant, the State violated the rule that a search warrant can be executed only once. As a result, the defendant contends that evidence obtained as a result of later entries to the trailer and the garage, as well as any derivative evidence, must be suppressed. The State counters that the multiple entries were authorized under the search warrant and none of the evidence obtained is subject to suppression.

#### The Search Warrant

The search warrant issued on November 5, 2005 authorized the search of three separately denominated premises. Specifically, the warrant authorized a search of the

1

defendant's single-family trailer and detached garage, the residence and garage of Barbara Janda, the defendant's sister, and finally, the 40-acre parcel which comprises the Avery Auto Salvage business, including outbuildings and vehicles located on the property. The warrant specifically authorized the police to search for Teresa Halbach, her 1999 Toyota RAV4 vehicle, any items of her clothing or other property, forensic evidence including but not limited to fiber evidence, blood, hair, saliva, semen, and fingerprints, as well as any weapons or instrumentalities capable of taking a human life. Additional findings are incorporated into the court's decision.

## Summary of the Parties' Arguments

There is no dispute that in their execution of the search warrant, representatives of the State entered Mr. Avery's trailer on no less than seven occasions and entered his garage on no less than four occasions. The defendant argues that these admitted multiple entries by the State violate the well-established rule that a search warrant may be executed only once and that once a search warrant has been executed, the police may not return for further search efforts without obtaining another warrant. The State counters with what the court perceives as three separate arguments, the first two of which are related. First, the entries to the defendant's garage and trailer should be viewed not as isolated entries to one property, but as part of a single search of the entire salvage yard property covered by the warrant. Viewed in this light, argues the State, the multiple entries were simply small parts of a permissible very large search that no one disputes necessarily took days to complete. The State's related argument is that while a search warrant may be executed only once, multiple entries are sometimes permitted pursuant to

2

one warrant as a reasonable continuation of the warrant's original execution. The State argues that the particular facts in this case justify multiple entries as part of the single execution of the warrant. Third, the State argues that even if some of the entries were unauthorized, no evidence should be suppressed because the evidence obtained is otherwise admissible under the inevitable discovery rule.

Both parties acknowledge the well-established rule that a search warrant may be executed only once. Under the facts in this case, however, stating the general rule only begs the question. The issue here is, at what point was the November 5, 2005 search warrant fully executed with respect to the defendant's trailer and garage? The defendant acknowledges that the first brief walkthroughs of the trailer and garage in the late afternoon of November 5, 2005 did not represent the execution of the warrant with respect to these buildings, but the longer initial searches of the trailer and the garage on the evening of November 5 and the morning of November 6, 2005 respectively did represent the full execution of the warrant, at least with respect to Steven Avery's trailer and garage.

## DECISION

The parties acknowledge that this appears to be a case of first impression in Wisconsin. The court agrees and notes that the case appears to be unique in at least two respects. First, neither party has cited the court to any Wisconsin case addressing the issue of whether the premises described in a search warrant should be separated in determining whether the State has improperly executed the warrant. The analysis to be employed by the court in assessing the defendant's motion is much different if the court

considers only the search of the defendant's residence and garage as opposed to the entire property described in the warrant. Second, the parties have not cited the court to any Wisconsin case addressing the propriety of multiple entries under a single search warrant. The defense cites the case of State v. Douglas, 123 Wis. 2d 13 (S. Ct. 1985) which addresses the issue of multiple entries under a consent search. As the court will discuss further, that case has some relevance to the issues here, but is not controlling.

I.

The court first addresses the argument most strenuously asserted by the State, that is, that the single warrant which was issued did not cover merely Mr. Avery's trailer and garage, but the entire Avery property, which consisted of many buildings and approximately 3,800 vehicles and the searches of the defendant's property cannot be evaluated in isolation. The multiple entries to the trailer and garage were reasonable, argues the State, because they were just part of an expansive search authorized by the warrant which necessarily took days. The State argues that the one decision most relevant to this case is United States v. Squillacote, 221 F. 3d 542 (4th Cir. 2000), in which the court approved a single search by F.B.I. agents of the defendant's residence which extended over six days. The court approved the search because the home was large and extremely cluttered, and the officers were looking for evidence of espionage, such as miniature film, memory cards, and other items which were extremely small. In approving the multiple day search, the court reasoned:

Where a search is authorized by a warrant, we believe it unnecessary and improper to isolate certain conduct occurring during the execution of the warrant and treat that conduct as a separate and discrete search. Instead, the government's actions

4

while executing a warrant must be considered in context, and the question that must be answered is whether the government exceeded the scope of the warrant."

. . . . .

Therefore, notwithstanding the large number of agents involved in the search, it is apparent that the search could not have been completed in a single day. Under these circumstances, the subsequent entries were not separate searches requiring separate warrants, but instead were simply reasonable continuations of the original search. The government, therefore, was not required to obtain additional warrants for each day that the search continued. 221 F. 3d at 555, 557.

In his summary of the law on this subject, Professor LaFave notes that while a search warrant may be executed only once, "if a particular warrant execution has not yet ended and not all the described items have been found, it is permissible for the police to retrace their steps and search more carefully areas searched earlier." LaFave, *Search and Seizure*, (4th ed., 2004 §4.10(d), Vol. 2, p.768.

While the defendant here argues that the multiple entries to his residence and garage went beyond the scope of the warrant, he does not challenge the State's assertion that the search of the entire property described in the warrant required days to complete.[1] The defendant's argument is premised on the notion that the court is limited to considering just the entries to the defendant's premises in evaluating the propriety of those multiple entries. The defendant has not cited the court to any case from any jurisdiction which utilizes this methodology, that is, isolates a portion of the premises authorized to be searched in determining the propriety of the search. The court has not

---

[1] The defendant does argue that treating the defendant's residence with the entire salvage yard "runs afoul of the prohibition against general warrants." While the area covered by the warrant is admittedly large, the court does not believe it is improperly wide ranging or exploratory. The victim's vehicle was last reported at the defendant's residence and was found, apparently covered up, somewhere in the 40 acre salvage yard. The vehicle's license plates were found in another junked vehicle in the salvage yard and her remains were reportedly found in the defendant's burn pit. Given the availability of the entire salvage yard in which to hide something and its proximity to the defendant's residence, the court sees nothing improper about the scope of the warrant.

5

been able to find any case which either raises the issue or resolves it. Because the reasonableness of a multi-day search under the scope of the entire premises described in the warrant is conceded, and because the court is unaware of any authority to evaluate searches of a segmented area described in the warrant in isolation, the court concludes that the admitted multiple entries to the defendant's property did not exceed the authority granted by the November 5, 2005 search warrant. The reasonableness of the multi-day search itself is not challenged and the defendant's premises were part of the premises authorized to be searched.

## II.

Notwithstanding the court's conclusion that the multiple entries were part of a proper single execution of the November 5, 2005 warrant, the court will further address the defendant's motion on an entry by entry basis to the defendant's trailer and garage. The court chooses to do so because while the court is aware of no cases which have sanctioned such analysis, there are legitimate reasons raised in the defendant's argument why a court might conclude that the search of the defendant's trailer and garage should be treated separately. For example, the State certainly could have sought three separate warrants, one for the defendant's premises, one for the Barbara Janda premises, and a third for the salvage yard. One may legitimately ask whether the choice of the State to obtain a single search warrant for the three separate premises described in the warrant rather than three separate warrants should have the substantive effect of allowing multiple entries into the defendant's trailer and garage over a number of days that might not be permissible if one warrant covered only the defendant's trailer and garage. Additional

6

concerns include the fact that the defendant did not own or control the bulk of the 40-acre Avery property, but only controlled the trailer, garage, and immediately surrounding area which he occupied on the property. The law traditionally considers a person's residence more sacred for search purposes than an entire auto salvage yard. Our own Supreme Court recognized this fact in State v. Douglas, 123 Wis.2d 13, 25 (1985):

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: `The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that `[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman v. United States*, 365 U.S. 505, 511.

While it is true the defense has not cited any case authorizing this court to consider only a portion of the premises covered by a single search warrant in its analysis, the State has not cited the court to a case in which a single warrant covered not only a residence, but large business operation as well. It is possible a Wisconsin appeals court could find that the fact that the entire parcel to be searched required significant amounts of manpower and time should not, by itself, justify multiple entries into the defendant's residence. Thus, the court believes it is appropriate to evaluate the defendant's motion on an entry by entry basis.

There are a number of cases from other jurisdictions which address whether a single search warrant can, under some circumstances, authorize multiple entries. Those cases recognize what this court would characterize as a generally accepted rule that a single search warrant may authorize more than one entry into the premises described in

7

the search warrant as long as the subsequent entry or entries are considered a "reasonable continuation" of the original search. That is, while a search warrant authorizes only the execution of a single search, it may more than one entry as part of the single search. A number of cases which have applied the reasonable continuation rule are described and summarized in United States v. Keszthelyi, 308 F. 3d 557 (6th Cir. 2002). Keszthelyi notes that the cases which have applied the reasonable continuation rule are guided by at least two common principles. First, any subsequent entry must indeed be a continuation of the original search and not a new and separate search. Second, the decision to conduct multiple entries as continuations of the original search must be reasonable under the totality of the circumstances. A search conducted pursuant to a lawful warrant may last as long and be as thorough as reasonably necessary to fully execute the warrant. Officers may generally continue to search the premises described in the warrant until they are satisfied that all available evidence has been located. Once the execution of the warrant has been completed however, the authority conferred by the warrant terminates. The court is satisfied that when confronted with a proper case, our Supreme Court and appeals courts would apply the reasonable continuation rule as it has developed in other jurisdictions.

If the court was required to apply reasonable continuation rule to the entries to the defendant's trailer and garage in this case, the court would do so as follows:

**Initial Sweep Searches on Saturday, November 5, 20005**

Shortly after the search warrant was issued on November 5, 2005, police officers completed a 10-minute sweep search of the defendant's trailer and an 8-minute sweep

8

search of his garage looking for any obvious evidence relating to the whereabouts of Teresa Halbach. The defendant concedes that these brief entries did not amount to a full execution of the search warrant.

## 2nd Trailer Entry on Saturday, November 5, 2005

Police officers entered the defendant's trailer for a second time at 7:30 p.m. on Saturday, November 5, 2005. The officers were in the trailer for a little more than two and a half hours and seized approximately 50 pieces of evidence, including some trace evidence. One of the searchers, Lieutenant James Lenk, testified that at the time of the search he believed everything of evidentiary value had been seized. It is this search of the trailer which the defendant asserts completed the execution of the search warrant, at least with respect to the defendant's trailer. While Lt. Lenk's statement concerning the thoroughness of the search supports the defendant's position, it must be kept in mind that Lt. Lenk was really a mere foot soldier and not a commanding officer in the investigation. Special Agent Thomas Fassbender of the Wisconsin Department of Justice, Division of Criminal Investigation, and Inspector Mark Wiegert of the Calumet County Sheriff's Department were in charge of the investigation. The many officers who participated in the investigation reported back to Fassbender and Wiegert, who then evaluated the reports and determined future search activities. Fassbender testified that following the report of guns and a vacuum cleaner found in the trailer, he knew the officers would be returning before execution of the warrant was completed. Of course, neither Fassbender's nor Lenk's characterization of the search activities is determinative. The subsequent entries must be evaluated under the totality of the circumstances as they

9

existed at the time. However, there is no evidence in the record to suggest that Fassbender or Wiegert viewed the search of the trailer to have been fully executed after this entry. The process was for those officers who participated to report their findings back to Fassbender and Wiegert, who would evaluate the results and determine whether additional entries were required.

## 2nd Garage Entry on Sunday, November 6, 2005

The second entry of the defendant's garage, which the defendant asserts completed the search, took place between 8:00 a.m. and 9:47 a.m. on Sunday, November 6, 2005. Officers seized some .22 shells along with suspected trace blood evidence which were later learned not to be attributable to Teresa Halbach. This search of the garage was conducted by Lt. Lenk, Sgt. Colborn, Detective Remiker and Deputy Kucharski of the Calumet County Sheriff's Department. The testimony of Lt. Lenk and Det. Remiker indicates that the officers who participated were able to stay as long as they felt necessary to complete the elements of the search they deemed necessary at the time. Detective Remiker testified that no one kicked them out of the garage at any particular time and they were able to stay as long as they wanted. It is this search of the garage which the defendant asserts completed execution of the warrant with respect to the garage.

## 3rd Trailer Entry on Sunday, November 6, 2005

The first entry which is contested by the defendant as being beyond the scope of the warrant was the third entry to the defendant's trailer from 12:25 p.m. to 12:48 p.m. on Sunday, November 6, 2005. Deputy Kucharski of the Calumet County Sheriff's Department received information that officers should re-enter the trailer for the purpose

10

of collecting weapons, a vacuum cleaner, and bedding from the spare bedroom. These were items that officers had observed in the trailer during their previous search on the morning of November 5.

The court concludes that this entry to the trailer was a reasonable continuation of the initial search from the previous morning. The entry took place within 24 hours of the previous search and was brief in time, lasting only 23 minutes. The officers were not searching for additional evidence, but retrieving items that had already been observed during the initial search. In this respect, the re-entry parallels re-entries that were approved in United States v. Bowling, 351 F. 2d 236 (6th Cir. 1965) and United States v. Carter, 854 F. 2d 1102 (8th Cir. 1988). The defendant is not arguing that the items seized during the search were not within the scope of the warrant, but is only questioning the re-entry. Because of the wide-ranging scope of the search authorized by the warrant, Special Agent Fassbender and Investigator Wiegert could not be personally present for numerous searches and entries that were taking place simultaneously. The court finds significant the fact that the primary focus of the search at this point in time was finding Teresa Halbach. The initial sweep search had already demonstrated she was not in the trailer or the garage. It was reasonable for Fassbender and Wiegert to review the findings of the officers that were assigned to search various areas and evaluate the need to seize particular items of evidence after receiving those reports. Conducting the search in this manner was less intrusive than seizing all items of evidence which fell within the scope of the warrant during the initial entry.

11

## 4th Trailer Entry on Sunday, November 6, 2005

The fourth entry to the defendant's trailer also took place on November 6, 2005 when representatives of the State Crime Lab searched the trailer using alternate lighting sources to search for blood. The search apparently took place on Sunday evening after the Crime Lab representatives spent time earlier in the day searching a number of vehicles in the salvage yard, the car crusher, a golf cart, and other areas looking for trace evidence. The record does not indicate exactly how much time the Crime Lab investigators spent in the trailer on the evening of November 6, but they reported back to Special Agent Fassbender that they found areas in the trailer which showed the presence of blood or potential presence of blood, collected samples in some of the areas and identified other areas which required additional collection. As a result, Fassbender directed additional entries to collect the information requested by the Crime Lab investigators. Fassbender further testified that while representatives of local police agencies are allowed to collect evidence, in cases where the State is called in for a homicide investigation, he always uses Crime Lab technicians to collect evidence.

The court concludes that the November 6, 2005 entry to the Avery trailer by representatives of the crime lab was a reasonable continuation of the execution of the search warrant. It was the first entry by Crime Lab personnel who routinely collect evidence in homicide cases investigated by DCI. Fassbender knew from the beginning that Crime Lab personnel would search the trailer. They did so following their arrival from Madison and searching of some other specifically suspect locations, including some junked vehicles and a golf cart. The representatives used alternative light sources to look

12

for blood evidence which had not been utilized previously by local law enforcement personnel. The nature of the trace evidence search conducted by the Crime Lab personnel was different and more thorough than that conducted by representatives of local law enforcement agencies. The facts in this case bear a similarity to those in State v. Douglas, 123 Wis. 2d 13 (1985), one of the few Wisconsin cases which has some relevance to the legal issues raised in this case. Douglas involved a search conducted pursuant to the consent of the defendant rather than a search warrant. The holding of the case was that the defendant's permission to enter his residence on the evening of November 7, 1983 did not extend to a police entry two days later for the purpose of attempting to recreate the crime from known facts. What is interesting for purposes of our case is that the defendant in Douglas did not even challenge the investigation by State Crime Laboratory personnel, who searched the scene from 11:50 p.m. on November 7 until 3:30 a.m. on November 8, and then returned later on the 8th to continue to search the premises until 8 p.m. that evening. The court believes that the Crime Lab personnel in this case were not required to search the trailer contemporaneously with the earlier search by local law enforcement personnel. The Crime Lab people didn't arrive on the scene until later Sunday afternoon. They had a number of other locations within the 40-acre search warrant site that also needed to be searched. Use of Crime Lab personnel, who have expertise in collecting trace evidence, was a reasonable part of the execution of the search warrant in this case.

13

## 5th Trailer Entry on Monday, November 7, 2005

On November 7, 2005 Lt. Lenk, Sgt. Colborn, and Sgt. Tyson from Calumet County briefly entered the defendant's trailer at 9:57 a.m. They were directed to return to the trailer for the purpose of retrieving the serial number of the computer which had been observed in previous searches. The officers got the information and left the trailer at 10:04 a.m.

The court finds this entry to be a reasonable continuation of the initial search. The entry did not really involve a search, but simply a follow up of an earlier search in order to obtain the serial number off of a computer the officers already knew was located in the trailer. The information was used to obtain a search warrant to seize the computer, which had been observed in an earlier search, but was not included among the items authorized to be seized pursuant to the initial search warrant.

## 6th Trailer Entry on Tuesday, November 8, 2005

Lt. Lenk, Sgt. Colborn, and Deputy Kucharski of the Calumet County Sheriff's Department entered the defendant's trailer on November 8, 2005. They remained in the trailer from 8:25 a.m. through 12:08 p.m. As the court understands the testimony, they entered the trailer for the purpose of seizing the defendant's computer pursuant to a separate search warrant that had been obtained. In addition to seizing the computer under the new search warrant, they also took swabs of some blood spots the crime lab had found in the bathroom. It is significant that the Crime Lab investigators had previously identified these spots as requiring collection. Lt. Lenk testified that they were also there to pick up pornography materials.

Because the police had a separate warrant to seize the computer, there is no doubt that the police had the right to enter the defendant's trailer in the morning of November 8, 2005. The court also concludes that there was nothing improper about taking the swabs of blood spots that had been found in the bathroom by the State Crime Lab because those actions were a reasonable continuation of the earlier search efforts by crime lab personnel which had not yet been completed. Special Agent Fassbender testified that after the crime lab had identified areas in the trailer with suspected blood on Sunday evening, he intended to follow up their suspicions with a search on Monday. However, because officers were involved with investigating other buildings and other scenes in the salvage yard on Monday, they did not get back into the trailer until Tuesday. He testified that, "and then Tuesday we were going back in, that that's where we put the team up to go back in there and hopefully do a final, thorough search of the trailer." *August 10, 2006 Tr. 95.*

The court agrees with the defendant that the pornographic materials seized were not described in the search warrant and are subject to suppression regardless of the entry during which they were seized.

**Subsequent Trailer and Garage Entries**

The testimony at the hearing disclosed that there was a third entry to the defendant's garage at 12:19 p.m. on November 8, 2005 by Lt. Lenk, Sgt. Colborn, and Deputy Kucharski during which they were looking for tools. There was a seventh entry to the Avery trailer on Wednesday, November 9, 2005 before the warrant was renewed

15

during which authorities were looking for a garage door opener, gloves and other items. Finally, there was another entry to the defendant's garage at 11:51 a.m. to 12:10 p.m. on November 9, 2005. Details concerning the items sought during this search were not provided during the testimony. Based on the lack of specific reasons given for these entries, whether or not they were authorized under the November 5, 2005 search warrant is dependent on whether the police were authorized by the terms of the warrant to make unlimited entries to the garage and trailer because of the scope of premises covered by the warrant. On an individual basis, the record does not disclose specific facts which would authorize the court to conclude that the specific entries were justified under the reasonable continuation rule. If the law required entry-by-entry analysis, the items seized during these searches would not be admissible, unless allowed under the inevitable discovery rule.

### III.

#### The Inevitable Discovery Rule

The State submits that even if some of the re-entries to the Avery trailer and garage exceeded the scope of the November 5, 2005 search warrant, the information gathered is nevertheless admissible under the inevitable discovery rule. The inevitable discovery rule is an exception to the exclusionary rule which applies when evidence has been obtained by illegal means. The rule was sanctioned by the United States Supreme Court in Nicks v. Williams, 467 U.S. 431 (1984). In Nicks, the court held that if evidence was obtained by the police as the result of illegal activity or as the fruits of

16

illegal activity, but would otherwise have been obtained by legal means in any event, the evidence can still be admissible. The court ruled as follows:

> However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to insure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct." 467 U.S. at 447.

Although Nicks approved the inevitable discovery rule, the case did not provide a framework for the application of the rule. Wisconsin cases have acknowledged the validity of the inevitable discovery rule and approved the framework for its application stated by the 5th Circuit Court of Appeals in United States v. Cherry, 759 F.2d 1196 (5th Cir. 1985). The test to be applied is set forth in State v. Schwegler, 170 Wis. 2d 487, 500 as follows:

> The proponent of the doctrine must show by a preponderance of the evidence that the tainted fruits inevitably would have been discovered by lawful means. To do so, the prosecution must demonstrate: (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the government at the time of the misconduct; and (3) that prior to the unlawful search the government also was actively pursuing some alternate line of investigation. *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985), cert. denied, 479 U.S. 1056 (1987).

With respect to the first prong of the test, the State argues that there is a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct because the State applied for and received a second warrant to inspect the defendant's trailer and garage on November 9, and that warrant is amply

17